### MISSOURI VALLEY BRIDGE & IRON CO. v. INLAND WATERWAYS CORPORATION.

### SAME v. UNITED STATES.

### UNITED STATES v. MISSOURI VALLEY BRIDGE & IRON CO.

#### Nos. 20562, 20598, 20783.

District Court, E. D. Louisiana.

Oct. 2, 1934.

John D., M. A. & Edwin H. Grace and Henry & Cooper, all of New Orleans, La., for Missouri Valley Bridge & Iron Co.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., and W. B. Spencer, Jr., Asst. U. S. Atty., both of New Orleans, La., for Inland Waterways Corporation and the United States.

BORAH, District Judge.

These three libels arise out of a collision that occurred on the Mississippi river on December 18, 1928, between the towboat Illinois, a vessel owned by the United States and operated by the Inland Waterways Corporation, and certain floating equipment belonging to the Missouri Valley Bridge & Iron Company. As the facts involved in each case are identical, the libels were consolidated for the purpose of trial, and accordingly may be disposed of in one opinion.

The Cairo Highway bridge, which was the scene of the accident, extends across the Mississippi river at Cairo, Ill., and looking down stream the Missouri shore is on the right and the Illinois shore is on the left. The bridge which was then in the course of construction has, according to plan, eight concrete piers, same being identified in the record as piers A to H, respectively, pier A being the first pier on the Illinois side and pier H being the last pier on the Missouri side. The piers involved in this controversy are D and E, and E and F. The clearance interval between piers D and E is 674 feet, and the span between these piers is the designated channel span. The span between piers E and F, where this collision occurred, was designated by the United States engineers as the temporary channel span, and the clearance interval between these piers is 424 feet.

The Missouri Valley Bridge & Iron Company had a contract with the Cairo Bridge & Terminal Company to construct the foundation piers, abutments, and pedestals for this highway bridge. The American Bridge Company of New York also had a contract with this company for the fabrication, erection, and construction of the steel superstructure. On the afternoon of the day in question both of these bridge companies were engaged in the performance of work under certain permits granted by the United States engineers of St. Louis, Mo. The Missouri Valley Bridge & Iron Company was engaged in completing the concreting of pier E and had its equipment which consisted of a mixer barge, two material barges and a derrick barge so grouped around pier E that it occupied 67

feet of the available channel space between piers E and F. The mixer barge, which had a length of 90 feet and a beam of 32 feet, was anchored up stream from the center line of pier E; the derrick barge was made fast to the pier and was lying in practically the same relative position down stream, and the two material barges, overlapping each other, extended outwardly from the derrick barge in the direction of pier F.

On the day of the accident, the Illinois took her departure from St. Louis with four barges in tow. Upon arriving at Upper Greenfield Bend Light, which was three and a half miles above the Cairo Highway bridge, the tow was divided, and at 3:10 p. m. she proceeded down the river with the two remaining barges, one on the head and one on the towline on the starboard side. According to the version of the pilot on duty, the tow was divided because he knew he would be obliged to run the narrow span between piers E and F, and, while he does not state the source of his information, his explanation appears plausible because the record does show that all pilots on the Mississippi river were notified by the Lighthouse Service on November 10, 1928, that the channel span would be blocked by the construction of a false pier. Furthermore, he says that he discussed this matter with his copilot, who has not been produced as a witness, and with the master, and that they all knew that they were going through the narrow Missouri span. The master, however, has a somewhat different recollection, and testified that it was he who suggested splitting the tow; that he thought they were going to run the channel span, and that he was not advised by any one that there was an obstruction there. He also makes the significant observation that, if the pilots had received this information, it is his thought that they would have said something about it. Up to this point in the pilot's testimony it therefore may be safely said that his story, not only lacks corroboration, but it stands refuted in all particulars, save that touching his knowledge. Whether he actually knew the channel span was blocked is entirely subjective, but it does not follow, according to his explanation, that this was necessarily the factor that influenced his decision to split the tow, for the testimony in this case shows that during the first eighteen days of December, which was the only period concerning which inquiry was made, all towboats operated by the Inland Waterways Corporation divided their tows before reaching this bridge on the downstream run. Analyzing further the testimony of the pilot it would appear that he did not get a clear view of the Missouri span until after passing Birds Point, and that it was only then when about a half mile distant that he observed the span partially blocked. He says that the current was strong and the wind was off the Missouri shore, and because of the weight ahead and the force of the current it was then impossible to stop, hence there was no alternative but to drive the tug and tow through at full speed. He contends that upon reaching Birds Point his vessel was lying about straight with the shore, lying as straight with the current as possible; that at Birds Point the current sets for the Illinois shore and the problem of the navigator is to overcome this set and get straight again. This maneuver, according to his description, necessarily places the boat on an angle in the current with the result that in navigating this span the bow of the tow would be headed towards the Missouri shore and the stern would be pointing in the direction of the Illinois shore. Other navigators say he would be required to maintain this position until the effect of the draft out of the chute on the Illinois side of Angelo Towhead was felt, and at which time he would be required to give the towboat a kick and straighten up before shoving through the span. While it does not appear that the pilot was questioned specifically with reference to whether or not this cross set in the current was a factor which he considered, he does say that, had the tow not hit the barges grouped around pier E, he would have been compelled to back the Illinois to shape her for Cairo Point Light because of the sand bar below the Missouri span. But on this occasion, as he explains, he did not put the engines full speed astern until after the Illinois was in the span, and he admits that he did so, not in an effort to shape a course for Cairo Point, but in an effort to clear the pier and barges. He was unable, however, to overcome the force of the wind and the current, and the port stern of the barge on the head came into collision with the mixer barge, sinking it and two material barges as well, besides causing considerable damage to the Illinois.

Now the wind which the pilot describes as "a pretty good gale" was a wind which in his judgment was blowing at the rate of five or six miles an hour, and the "strong current" which he describes was a current which according to maximum estimates did not exceed three and a half to four miles per hour, therefore I take it that there were no unusual conditions that existed on the day of the accident.

I am persuaded, however, that, even under these normal conditions, the temporary span was somewhat difficult for the Illinois and her tow to navigate, not only because of the presence of a sunken wreck one hundred yards from shore above pier F and because of the sand bar below the span, but because of the sets in the current. However, in my judgment the span was not so inherently or plainly dangerous as to be likely to cause damage to any tug and tow going through it; therefore the natural inquiry is to what cause or causes is this accident attributable.

Three responsible officials of the American Bridge Company, with but slight variation in their testimony, stated that they were standing on the outward edge of span 4, which structure extended 175 to 200 feet beyond pier D, looking at their pile driver gang working down below 350 feet from pier D on one of the temporary piers when some one called their attention to the Illinois coming down stream with a tow. At that time the Illinois was in the middle of the river about a mile distant and was headed apparently in the direction of where their equipment was located, as though intending to pass between piers D and E. As the Illinois continued on this course they became apprehensive, and the tug or motorboat Ambrico was dispatched up stream to warn the Illinois that the channel span was blocked. Distress signals were also blown by their pile driver. As the Ambrico proceeded up stream, they observed that the Illinois began to turn to the right and head for the temporary channel span, apparently realizing that she could not go between piers D and E because of a wire cable extending from the pile driver to pier E. According to their estimates and that of other eyewitnesses, this belated change of course was not made until the Illinois had approached to within a distance of between 300 and 1,200 feet.

The motorboat operator and the deck hand of the Ambrico testified that they went up stream to within 300 feet of the Illinois, and that their signals to her to go to the right were acknowledged by two short blasts of the whistle. While it is true that the master of the Illinois and the pilot on duty, the only two eyewitnesses produced by the Illinois, denied seeing this 40-foot motorboat or hearing the distress signals which were blown by the pile driver, the probabilities would nevertheless seem to indicate that the contrary is the view that should be adopted.

The fact that the Illinois, upon changing course, continued ahead full speed and did not reverse her engines until she was in the temporary channel span, clearly indicates that she was not in a position to navigate this span. Indeed the master admits that, because of the wind and current, the pilot did not have time to get his tow in proper shape, and the pilot inferentially makes the same admission, for he says that the existing wind and current were such that he could not definitely state whether or not he would have been successful in avoiding this collision had the equipment not been there. However, he explains that, had the barges not been there, he would have had more space, and space was what he wanted. It is difficult to perceive how this testimony of the master and pilot espouses the cause of the Illinois. If the conditions of wind and current were as hazardous as these witnesses declare, they were clearly negligent in attempting to run this narrow span with two barges in tow, as the existing conditions were either known or should have been known to them at the time when they divided their tow which was only twenty minutes before the accident occurred. If this was the situation, and I am convinced that it was not, they should have shown greater regard for life and property and negotiated the movement with one barge only.

Without prolonging this opinion to undue length by analyzing the testimony of each and every witness produced, sufficient be it to say that in my judgment the conclusion is irresistible that the pilot of the Illinois carelessly proceeded on a course that would have taken him through the main channel span, and upon approaching the bridge he was either warned or observed that the channel span was blocked, and in his endeavor to extricate himself he was compelled to take unnecessary chances with his tow.

The fact that those responsible for the navigation of the Illinois carelessly came to this decision does not relieve the Missouri Valley Bridge & Iron Company from blame if it was also in the wrong.

The question of permits is one of the issues involved, and the testimony with reference thereto shows that on October 4, 1927, the Missouri Valley Bridge & Iron Company was granted a permit by the United States engineers for the construction of pier D. This permit contained the provision "that there shall be no unreasonable interference with navigation by the work herein authorized" and "that either (a) at least 550 feet width of channel through the main channel span, or (b) the full width of channel (430 feet) through the next channel span south-

ward shall be kept clear of obstructions and open to navigation." On February 9, 1928, the Missouri Valley Bridge & Iron Company obtained another permit from the United States engineers which authorized the construction of pier E, and this permit contained the conditions "that there shall be no unreasonable interference with navigation by the work herein authorized," and the proposed tram and pier anchorage plan which was attached thereto bears the notation, "Channel of at least 550 feet effective width will be maintained at all times between piers D and E."

A permit dated November 28, 1927, was also issued to the American Bridge Company to place false work in the construction of the bridge, and it likewise provides: "That there shall be no unreasonable interference with navigation by the work herein authorized" and on the proposed plan of temporary false work which was attached thereto appears the following, "Minimum navigable channel at least 9 feet deep and 424 feet wide will be maintained at all times between piers C and F." In other words, the purport of this language is to convey the thought that, if the channel span was blocked, the span between piers C and D (which could not be navigated on December 18, 1928) or the span between piers E and F must be kept open because each of these spans only have a clearance of 424 feet.

While the testimony shows that the work on pier D was completed before the collision occurred, and that the Missouri Valley Bridge & Iron Company did not have any of its equipment in the channel span between piers D and E, still they knew that the main channel span was completely blocked, and their authority to place any equipment or obstruction in the span between piers E and F would seem to be contingent on whether or not there was in fact a 500-foot effective channel width in the span between piers D and E. But, even if they did not violate their authority in this regard, it must be borne in mind that both of the permits which were issued to the Missouri Valley Bridge & Iron Company contained the provision, "That there shall be no unreasonable interference with navigation by the work herein authorized."

It is plain that this floating equipment by its bulk and position created a dangerous situation to vessels which were obliged to use this span. It was grouped around pier E in the channel. It was tied up and anchored, and unable to extricate itself at the approach of danger; it prevented or at least obstructed the Illinois and her tow from going through the narrow span she was compelled to take, and it constituted an unreasonable interference with navigation. So far as I can see, there was no necessity for the equipment blocking any of the available channel space between piers E and F, save for the convenience of its owners. If the Missouri Valley Bridge & Iron Company concluded to assume the risk of anchoring and mooring their equipment in an improper place, they must take the consequences which fairly result from their improper act.

The fact that the owner and operator of the Illinois have also been found at fault does not, under the circumstances disclosed by this record, palliate the offense of the Missouri Valley Bridge & Iron Company, but it does provide for it a companion in misfortune and liability. The Missouri Valley Bridge & Iron Company, having violated the authority which was conferred under the permits, was required, in order to excuse itself for that fault, to show, not only that its fault did not contribute to the disaster following, but also that it could not have done so. This they have signally failed to do.

It follows that the Missouri Valley Bridge & Iron Company is entitled to a decree against the United States and the Inland Waterways Corporation for half damages and a reference to compute the amount.